**FETZER TELEVISION, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 14986.**

United States Court of Appeals
Sixth Circuit.

May 13, 1963.

John C. Howard, Kalamazoo, Mich., (Howard & Howard, Kalamazoo, Mich., on the brief), for petitioner.

Margaret M. Farmer, Atty., N. L. R. B., Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Atty., N. L. R. B., Washington, D. C., on the brief), for respondent.

Before MILLER and WEICK, Circuit Judges, and THORNTON, District Judge.

THORNTON, District Judge.

Petitioner, Fetzer Television, Inc., here seeks review of an order of the National Labor Relations Board asking that the Board's Decision and Order of March 26, 1962 be vacated. Petitioner was found to have engaged in unfair labor practices by failing to bargain in good faith. The Board cross-petitions for enforcement. The Decision contains the usual affirmance of the rulings of the Trial Examiner. The Order contains a cease and desist provision and an affirmative action provision, the substance of each being implicit in the other.

The core of this controversy may be stated succinctly as the head-on encounter of irresistible force and immovable body, with result and consequence to be evaluated and judged in the light of the numerous judicial interpretations of what constitutes good faith (or the lack of it) within the purview of 29 U.S.C.A. § 158(d). This subsection reads as follows:

"For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: * * *."

The above quoted subsection implements 29 U.S.C.A. § 158(a) (5) which makes it an unfair labor practice for an employer to refuse to bargain collectively with representatives of his employees. The Trial Examiner, affirmed by the Board, has found by his Decision and Order that petitioner violated § 158(a) (5) and (1) of Title 29 U.S.C.A. and had therefore engaged in unfair labor practices. [29 U.S.C.A. § 158(a) (1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;" (157 relates to the rights of employees to organize, bargain collectively, etc.).]

The parties agree in their respective statements as to the basis for the Board's findings * * * that the failure of petitioner to bargain in good faith is evidenced

A) by its refusal to furnish certain requested wage data to the Union;

B) by unilaterally changing its method of pay (wage payments) without consulting (or notifying) or negotiating with the Union;

C) by conducting its negotiations with a fixed intention of not reaching or entering into an agreement. We hereafter refer to the above three classifications as categories A, B and C.

The period covered by the Board's findings is November 22, 1960 to August 25, 1961, the latter date being the date of the issuance of the complaint by the General Counsel. By way of background, the Board also considered those negotiations which occurred during a three-month period shortly preceding November 22, 1960. These negotiations were carried on by the Union and petitioner in an effort to effect a collective bargaining agreement. The areas in dispute which formed the subject matter of the bargaining sessions held during this period, August 24, 1960–October 28, 1960, were five in number * * * arbitration of grievances, seniority, probation period for engineers, union shop or union security, and wages. During the period August 24, 1960–October 28,

1960 eight bargaining sessions [1] were held at which Kevin Efroymson, attorney for the Union, was chief negotiator for the Union and Cletus E. Ellerman, petitioner's general manager and bargaining representative, was chief negotiator for petitioner.

The Trial Examiner, in his Decision and Order, has summarized what transpired at each of the eight sessions which took place between August 24, 1960 and October 28, 1960 to the extent he deemed relevant. (It should be borne in mind that these eight bargaining sessions were held prior to the commencement of the period covered by the violations found by the Trial Examiner and affirmed by the Board.) The conduct constituting the failure to bargain in good faith consists of the refusal to furnish the wage data requested, unilateral change in method of pay and conducting negotiations with a fixed intention of not reaching an agreement. In order for us to make our determination on this review, we must consider the above as related to the violation period, November 22, 1960–August 25, 1961. The Trial Examiner appears to have placed much reliance upon the proceedings at the eight bargaining sessions *prior* to the violation period. We will discuss their relevance shortly. Those sessions terminated October 28, 1960. At that time Ellerman stated an impasse had been reached and that he would discontinue negotiations until some future date. We reserve for the moment consideration of whether or not an impasse actually was reached. Assuming that it was, then the position taken by petitioner in relation to categories A, B and C previously adverted to has certain ameliorative aspects.

■ As to category A the wage data sought by the Union related to three employees whose status as employees includible in the bargaining unit was in dispute, it being the position of petitioner that these three were in a supervisory capacity and that there was therefore

no duty to furnish the requested wage data. A fourth individual, Newsman Jones, was also involved and it was the position of petitioner that he was not an employee as such but belonged to on-the-air personnel and was therefore excludible from the bargaining unit. This issue, category A, had been decided adversely to petitioner by the Board. Petitioner declined to comply pending decision of a review by this Court. We conclude as to this action, or nonaction, by petitioner that there was ample justification and that no substantial evidence existed upon which the Board could base a finding of unlawful refusal to bargain.

As to category B which involves the change in method of pay, there had been discussion of the change proposed by petitioner at some of the eight bargaining sessions. The Union objected to the change which involved a payday occurring every two weeks instead of semimonthly. The wage scale was not involved in the change. Petitioner had indicated its desire to change the pay periods several months prior to January 1, 1961. This proposed change was a subject of dispute. On October 28, 1960, the date of the last in the series of eight bargaining sessions which had commenced August 24, 1960, Ellerman stated that an impasse was reached and that any further meetings would have to be held at some future date. Petitioner put into effect the proposed change in method of pay on January 1, 1961. This was done after the impasse had been reached and prior to the resumption of further bargaining sessions. Petitioner had announced far in advance that it intended to put into effect the new pay dates. We make three observations which negate the existence of substantial evidence to support the Board's finding of unlawful refusal to bargain. First, petitioner gave full and convincing practical reasons for desiring the change. Second, the effective date of the change was the first day of the new calendar year. Third, from Ellerman's viewpoint nego-

---

1. Of these eight there were four that consisted of both a morning and an afternoon meeting.

tiations had reached an impasse. "[P]roof that an employer changed wage rates or other terms of employment in the midst of contract negotiations ordinarily gives rise to the inference that he had no intention of coming to an agreement; the factual inference can be negated by showing that there was a need for immediate action or by proving that the negotiations had reached an impasse." Cox, The Duty to Bargain in Good Faith, 71 Harv.L.Rev. 1401, 1423 (1958). Assuming an impasse had been reached, the Board's conclusion on this issue is not based on the requisite substantial evidence.

We now consider category C. It appears that during the violation period only two meetings were held between the Union and petitioner. It also appears that these did not constitute bargaining sessions as such * * * the impasse still prevailed. The first meeting (2 sessions) was held on January 13, 1961 and the second on August 1, 1961. We are persuaded from a review of the record presented here that the failure of petitioner during the violation period to enter into negotiations looking toward consummation of a collective bargaining agreement is justifiable for two reasons. One is that there were during that period at least two reviews pending before this Court, each of which involved areas in dispute between the Union and petitioner. Petitioner might well be justified in desiring a postponement of further negotiations pending such determination. Ellerman stated as much. He also stated in a letter of March 22, 1961 to Efroymson that there was a serious question at that time whether the Union represented a majority of the employees and that this was a determination that would have to be made. The other justification for petitioner not having resumed negotiations during the violation

period is the simple fact of the impasse reached only a few months previously, after a series of eight bargaining sessions over a two-month period (August 24, 1960—October 28, 1960). This brings us to a brief consideration of the negotiations which took place at those bargaining sessions. The Trial Examiner saw fit to include a brief summary of the sessions of each of the eight dates. We are impressed that his finding,[2] contained in his Decision and Order (affirmed by the Board's Decision and Order of March 26, 1962), that petitioner refused to bargain collectively in good faith, though relating to the violation period (November 22, 1960—August 25, 1961) is in fact based upon conclusions drawn from the proceedings at the eight bargaining sessions conducted during the August 24, 1960—October 28, 1960 period. (We except from this discussion the matter of furnishing wage data and the unilateral change in method of pay which we have heretofore disposed of.[3] We consider that the conduct and attitude of the parties to those negotiations are relevant to the issue category C only insofar as they may be determinative of whether or not an impasse was reached. It is here where we are conscious of the head-on clash of opposing forces. The five areas of disagreement which were the subject matter of the eight bargaining sessions were areas as to which each side had strong, if not adamant, views. It cannot be said that petitioner declined to "give" in respect to all five. Petitioner declined to concede to the demands of the Union in toto. It wanted a no-strike clause but refused binding arbitration. It may be that the two are customarily complementary but this is not to say that petitioner's prejudice against binding arbitration may be equated to lack of good faith. Ellerman explained that his experience had taught him to have little

---

2. that petitioner refused to bargain collectively in good faith "by conducting negotiations with a fixed intention of not reaching an agreement or entering into any final or binding collective-bargaining agreement."

3. This latter being on the assumption that an impasse had in fact been reached as of October 28, 1960.

confidence in binding arbitration. He was opposed to the principle of binding arbitration. He did offer a modified arbitration which was unacceptable to the Union.

The seniority as offered by the Union appeared to petitioner as depriving petitioner of the right to evaluate merit. The other aspects of this area included the measuring of severance pay, length of vacations, starting pay in wage rate classifications, regular advancements in the wage scale, vacation relief employment, interruptions in employment by promotions to supervisory positions, and absences due to illness or vacations. Petitioner did offer to make some concessions in this area contingent upon the Union agreeing to grievance proceedings that did not contemplate binding arbitration.

In relation to the union shop disagreement, petitioner offered to go along with the check-off of union dues proposal of the Union, this also being contingent upon the non-insistence of the Union upon binding arbitration. Also in relation to the union shop, petitioner offered to waive the no-strike clause if the Union would not insist on a union shop.

As to the remaining two areas, probation period for engineers and wages, there appears to have been a fundamental difference in viewpoint. Each side offered to compromise its demand as to the probation period, contingent upon certain other concessions being made. Neither side would make the stated concessions. On the question of wages the Union wanted a wage scale based on that prevailing at an affiliated station of petitioner's at Kalamazoo. Petitioner's view was that a wage scale should be based on wages prevailing in the area of Cadillac where this controversy exists and where the employees involved are employed.

■■ We conclude that the impasse reached at the termination of the eight bargaining sessions was not one resulting from the failure of petitioner to bargain in good faith. In the case of National Labor Relations Board v. United

Clay Mines Corp., 6 Cir., 219 F.2d 120 (1955), this Court has set down the principles applicable to the situation here presented. We are guided by them and by the authorities cited therein in reaching the above determination. See also: National Labor Relations Board v. Cummer-Graham Co., 5 Cir., 279 F.2d 757, 760 (1960); National Labor Relations Board v. Superior Fireproof Door & Sash Co., 2 Cir., 289 F.2d 713, 721 (1961). Since petitioner did not fail to bargain in good faith at the eight bargaining sessions the impasse that resulted was a bona fide one. This being so, the unilateral change in method of pay effected by petitioner *after* the impasse was reached does not evidence a failure to bargain in good faith. The refusal to furnish the requested wage data has been heretofore disposed of by us.

We are not unmindful of the function of this Court in reviewing a decision of the Board. Section 160(e), 29 U.S.C.A., provides: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." The Supreme Court, in 1938, supplied the test of substantial evidence that has become a classic touchstone: "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. of New York v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126. In fixing our responsibility as a reviewing court for the Board's decisions, the Supreme Court has said: "We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds.

That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456.

■ Upon the record as a whole we conclude that the findings of the Trial Examiner and the Board are not based on substantial evidence. The Order of the Board will be vacated and its request for enforcement denied.